# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MATTHEW J. HILL and GREGG H. HILL, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | C.A. No. 2017-0591-MTZ |
| LW BUYER, LLC, a Delaware Limited Liability Company, | ) ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: April 8, 2019
Date Decided: July 31, 2019

C. Barr Flinn, Emily V. Burton, Elisabeth S. Bradley, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Nicholas M. Oertel, Richard C. Kraus, James B. Jensen, Jr., FOSTER SWIFT COLLINS & SMITH PC, Lansing, Michigan; *Attorneys for Plaintiffs Matthew J. Hill and Gregg H. Hill.*

William J. Lafferty, Kevin M. Coen, Jarrett W. Horowitz, MORRIS, NICHOLS, ARSHT & TUNNELL, LLP, Wilmington, Delaware; Craig S. Primis and K. Winn Allen, KIRKLAND & ELLIS LLP, Washington, D.C.; *Attorneys for Defendant LW Buyer, LLC.*

**ZURN, Vice Chancellor.**

The parties to this case entered into a securities purchase agreement in 2015 and escrowed funds to pay for valid post-closing indemnification claims. In mid-2016, the buyer asserted claims for indemnification of a diverse set of alleged tax deficiencies and breaches of the sellers' representations and warranties. In 2017, the sellers sued to settle the fate of those escrow funds and their personal liability, and the buyers counterclaimed. The sellers moved for partial summary judgment. In this opinion, I grant in part and deny in part the sellers' motion.

## I.     BACKGROUND

In the late 1990s, Matthew J. Hill founded Liquid Web, Inc. and Liquid Web, B.V. (together, "Liquid Web"). He and his father, Gregg H. Hill (together with Matthew J. Hill, the "Hills" or the "Sellers"), owned all of Liquid Web's equity.[1] They also jointly owned Hillcorp Properties LLC (together with Liquid Web, the "Companies"), an entity organized in 2005 that held real property associated with Liquid Web.[2] Private equity funds managed by Madison Dearborn Partners, LLC ("Madison Dearborn") created LW Buyer, LLC ("LW Buyer") to acquire Liquid Web.[3]

---

[1] Docket Item ("D.I.") 1 ¶ 1 [hereinafter "Complaint"].

[2] Compl. ¶ 18.

[3] D.I. 9, Counterclaims of LW Buyer, LLC ¶ 3 [hereinafter "Counterclaims"].

### A. LW Buyer Acquires The Companies.

Madison Dearborn and the Hills began discussing a potential acquisition of Liquid Web in early 2015 (the "Acquisition").[4]  On May 22, 2015, LW Buyer entered into a securities purchase agreement (the "Purchase Agreement")[5] with the Hills and the Companies.[6]  On July 1, the Acquisition closed (the "Closing Date").[7] LW Buyer paid $224,127,189 in cash on the Closing Date for the Companies, with an additional $416,000 following later that year as a working capital adjustment to the purchase price.[8]

As part of the Acquisition, the parties also entered into an escrow agreement (the "Escrow Agreement").[9]  Under the Escrow Agreement, LW Buyer delivered $11,250,000 (the "Escrow Funds") to the escrow agent to hold subject to valid claims for indemnification under Article 11 of the Purchase Agreement.[10]  On July

---

[4] Compl. ¶ 21.

[5] Compl. Ex. 1.  I quote the Purchase Agreement throughout this opinion subject to its internal definitions.

[6] Compl. ¶ 23.

[7] *Id.*

[8] *Id.* ¶ 24.

[9] *Id.* ¶ 25.

[10] *Id.* ¶¶ 26-27.

11, 2016, the escrow agent was to disburse the Escrow Funds to the Hills unless pending claims for indemnification required it to keep the Funds under lock.[11]

Article 3 of the Purchase Agreement lays out the Hills' and Companies' representations and warranties.[12] Several are relevant to this dispute. In Section 3.4, the Hills represented and warranted that they had delivered a series of audited and unaudited financial statements and balance sheets to LW Buyer. The Hills represented that certain annual and quarterly financial statements (the "Financial Statements") were

> (i) accurate and complete in all material respects, are consistent with and fairly present[ed] the consolidated and combined financial condition and the results of operations, changes in shareholders' equity, and cash flows of the Acquired Companies as at the respective dates of, and for the periods referred to in, the Financial Statements, and (ii) were prepared in accordance with GAAP, subject, in the case of [certain] compiled financial statements[,] . . . to normal recurring year-end adjustments (the effect of which will not, individually or in the aggregate, be material) and the absence of notes (that, if presented, would not differ materially from those included in the Audited Financial Statements).[13]

---

[11] *Id.* ¶ 31.

[12] Except as indicated in an external disclosure letter, the Hills and the Companies jointly and severally made each of Article 3's representations and warranties to LW Buyer. Purchase Agreement § 3. I focus on the Hills' representations and warranties, as do the parties. *See generally* Counterclaims ¶¶ 33-34, 38, 50 (discussing certain of the Hills' representations and warranties related to relevant provisions); Opening Br. 25 (same).

[13] Purchase Agreement § 3.4.

The Hills also represented that "[t]he Financial Statements reflect the consistent application of GAAP throughout the periods involved, except as disclosed in the notes to the Audited Financial Statements," that "[n]o financial statements of any Person other than the Acquired Companies are required by GAAP to be included or reflected in the Financial Statements," and that "[t]he Financial Statements were prepared from, and are consistent with, the accounting Records[14] of each Acquired Company."[15]  In Section 3.5, the Hills gave an additional, more general assurance that "[t]he books of account and other Records of each Acquired Company that have been made available to Buyer, are materially complete and correct, and represent actual and bona fide transactions."[16]

In Section 3.9, the Hills stated that no Company

> ha[d] any liability or obligation, other than liabilities or obligations to the extent shown on the Interim Balance Sheet and current liabilities incurred in the Ordinary Course of Business since the date of the Interim Balance Sheet (none of which is a liability for breach of contract, breach of warranty, tort, infringement, a claim or lawsuit, or an environmental liability) which would not, or would not be reasonably expected to, individually or in the aggregate, cause a Material Adverse Change.[17]

---

[14] The Purchase Agreement defines a "Record" as "information that is inscribed on a tangible medium or that is stored in an electronic or other medium."  *Id.* § 1.1.

[15] *Id.* § 3.4.

[16] *Id.* § 3.5.

[17] *Id.* § 3.9.

4

In Section 3.10, the Hills represented and warranted, among other things, that the Companies had timely filed relevant tax returns, otherwise had their tax affairs in order, and that "no claim has ever been made by any Governmental Body in a jurisdiction where any Acquired Company does not file Tax Returns that it is or could be subject to taxation by that jurisdiction, nor is there any reasonable basis for such a claim."[18]  In Section 3.13, the Hills represented and warranted that the Companies were in compliance in all material respects with relevant legal requirements.[19]

Article 11 contains the parties' agreement on indemnification.  In Section 11.2, the Hills agreed to indemnify and hold harmless LW Buyer and the Companies from "any Loss that [LW Buyer or other relevant parties] may suffer, sustain, or become subject to, as a result of, in connection with, or relating to:  (a) any Breach of any representation or warranty made by Sellers . . .; [or] (d) any Indemnified Taxes."[20]  The Purchase Agreement defines a Loss, in relevant part, to include "any cost, loss, liability (contingent or otherwise), obligation, claim, cause of action, demand, damage, deficiency, expense, fine, penalty, judgment, Tax, award or assessment, whether or not arising out of a third party claim," subject to certain

---

[18] *Id.* § 3.10.
[19] *Id.* § 3.13.
[20] *Id.* § 11.2.

conditions not relevant here.[21]  It defines Indemnified Taxes, in relevant part, as "Taxes (or the non-payment thereof) imposed on the Acquired Companies for any taxable period (or portion thereof) ending on or before the Closing Date, . . . and [] any breach by any Seller of the covenants contained in Section 12.1(g) or of the representations contained in Section 3.10."[22]  And it defines Taxes, in relevant part, as "any income,. . . sales, use, transfer, value added, . . . and other tax, fee, assessment, levy, tariff, charge, or duty or tax of any kind whatsoever and any interest, penalty, addition, or additional amount imposed, assessed, or collected by or under the authority of any Governmental Body whether disputed or not."[23]

Section 11.4 builds the procedure for the parties to notice an indemnification claim.  Section 11.4(a) deals with indemnification claims related to most alleged breaches of a party's representations and warranties, including those relevant here. The Hills are only liable if "on or before [July 1, 2016 (the "Survival Period Termination Date")]   . . . [LW Buyer] notifies [Gregg Hill, as the Sellers' representative,] of a claim, specifying the factual basis of the claim in reasonable detail to the extent known by [LW Buyer]."[24]  Claims for indemnification of an alleged breach of representations and warranties under Section 11.4(a) thus had to

---

[21] *Id.* § 1.1.

[22] *Id.* § 1.1.

[23] *Id.*

[24] *Id.* § 11.4(a).

6

be validly noticed by the Survival Period Termination Date. If they were not, they are untimely.

Section 11.4(c) governs certain other claims for indemnification, including for Indemnified Taxes under Section 11.2(d). The Hills may be liable for those claims "at any time so long as [LW Buyer] notifies [Gregg Hill] of a claim thereunder, specifying the factual basis of the claim in reasonable detail to the extent known by [LW Buyer]."[25] Section 11.4(c) makes clear that, "for the avoidance of doubt, the parties intend[ed] the survival period contemplated by this Section [] to be an indefinite period of time."[26] Thus, the parties carved up potential indemnification claims into different tranches. They locked some into a one-year survival date after the Acquisition to notice a claim, but allowed LW Buyer to submit notices for others "at any time."[27]

---

[25] *Id.* § 11.4(c).

[26] *Id.*

[27] *Id.* Delaware law permits parties to modify contractual limitation periods, within limits. *See generally Bear Stearns Mortg. Funding Tr. 2006-SL1 v. EMC Mortg. LLC*, 2015 WL 139731, at *14-15 (Del. Ch. Jan. 12, 2015); *Eni Hldgs., LLC v. KBR Grp. Hldgs., LLC*, 2013 WL 6186326, at *7 (Del. Ch. Nov. 27, 2013). The parties do not raise any concerns or issues with how the Purchase Agreement modifies these periods, and so I do not address that particular structure.

Section 11.6 sets out an additional procedure to govern claim notices for third-party claims ("Third-Party Claims").[28] In Section 11.7, LW Buyer agreed "to seek all payment of all claims under this Article 11," including the indefinitely surviving tax-related claims under Section 11.4(c), "first from the Escrow Funds until and unless the Escrow Funds are fully depleted or the amount of the then-pending claims equals or exceeds the Escrow Funds."[29] But while the Escrow Funds provide the "sole[] and exclusive[]" source of indemnification for claims under Section 11.2(a),[30] the Purchase Agreement does not so limit indemnification for tax-related matters. The parties agree that these provisions, read together, permit LW Buyer to seek indemnification of valid claims for Indemnified Taxes after the Survival Period Termination Date, and ultimately from sources beyond the Escrow Funds.

## B. LW Buyer Evaluates Its Liability And Makes Claims On The Escrow Funds.

In late 2015, LW Buyer hired Ernst & Young to assess Liquid Web's tax exposure.[31] Ernst & Young determined that Liquid Web owed various amounts of

---

[28] Purchase Agreement § 11.6. The Purchase Agreement defines a "Third-Party Claim" as "any claim against any Indemnified Person by a [a Person that is not an Acquired Company or a party to this Agreement], whether or not involving a Proceeding." *Id.* § 1.1.

[29] *Id.* § 11.7.

[30] Subject to certain exceptions not relevant here. *See id.* § 11.8(b).

[31] Counterclaims ¶¶ 60-61; D.I. 35 ¶ 10 [hereinafter "Flood Affidavit"].

pre-closing value-added taxes ("VAT") and sales and use taxes. For the sales and use taxes, Ernst & Young identified tax liabilities in various states, although none of those jurisdictions had assessed any taxes against the Companies.[32] Ernst & Young did not complete its preliminary assessment of VAT liability before the Survival Period Termination Date.[33]

On June 30, 2016, one day before the Survival Period Termination Date, LW Buyer sent the Hills a letter (the "First Notice")[34] asserting six claims for indemnification (each a "Claim").[35] LW Buyer estimated its Losses to be "at least $22,943,000," and purported to "reserve the right to revise and supplement this claim at any time and from time to time," as well its "ability to give additional notice in respect of the Claims or with respect to any other matters." A one-page chart attached to the First Notice named the six Claims, stated their factual bases, and

---

[32] The exact jurisdictions are not clear. In its Counterclaims, LW Buyer alleges that Ernst & Young has identified pre-closing sales and use tax Losses "in Arizona, California, Hawaii, Michigan, South Dakota, West Virginia, and the District of Columbia totaling over $330,000." Counterclaims ¶ 65. But in the later-filed Flood Affidavit, LW Buyer claims the relevant jurisdictions, at least at the time of the First Notice, were Arizona, the District of Columbia, Hawaii, South Dakota, and West Virginia. Flood Aff. ¶¶ 16-17.

[33] *Id.* ¶ 23.

[34] Compl. Ex. 3.

[35] Compl. ¶ 34.

provided a Loss estimate.  The four Claims relevant to this opinion are set forth in the chart below.[36]

| Claim | Factual Bases In First Notice | Loss Estimate In First Notice |
|---|---|---|
| The Value-Added Taxes claim (the "VAT Claim") | Buyer's investigation is ongoing, but it appears the Acquired Companies have obligations and other types of Loss with respect to value-added taxes and related compliance requirements in several jurisdictions (including Norway, the United Kingdom, Canada, the Netherlands, Estonia, Switzerland, South Africa, Sweden, Spain and other EU member states).  The existence of such obligations and other forms of Loss would constitute breaches of several representations in the Purchase Agreement (including Section 3.9 (No Undisclosed Liabilities), Section 3.10 (Taxes) and Section 3.13 (Compliance with Legal Requirements)) and such obligations and other forms of Loss would also constitute Indemnified Taxes. | Definitive amounts not yet known, but Buyer has incurred $224,000 of related expenses |

---

[36] *See* First Notice at 3.  Although the First Notice listed a series of alleged breaches of representations and warranties for the relevant Claims, many of those appear to have been abandoned at the pleadings and briefing stage.  I consider only those alleged breaches that LW Buyer continues to defend.

| | | |
|---|---|---|
| The sales and use tax claim (the "Sales and Use Claim") | Buyer's investigation is ongoing, but it appears the Acquired Companies have obligations and other types of Loss with respect to sales and use taxes in various jurisdictions (including Washington, California, Arizona, and Michigan). The existence of such obligations and other forms of Loss would constitute breaches of several representations in the Purchase Agreement (including Section 3.9 (No Undisclosed Liabilities), Section 3.10 (Taxes), and Section 3.13 (Compliance with Legal Requirements)) and such obligations and other forms of Loss would also constitute Indemnified Taxes. | $1,586,000 |
| The revenue and revenue growth misstatements claim (the "Revenue Misstatements Claim") | Inaccuracies in the conversion of the Acquired Companies' cash basis books to accrual basis financial statements led to materially misstated revenue and revenue growth on an intra-period basis, which inaccuracies constitute breaches of several representations in the Purchase Agreement, including Section 3.4 (Financial Statements), Section 3.5 (Books and Records), Section 3.8 (Accounts Receivable) and Section 3.9 (No Undisclosed Liabilities). | $14,778,000 |
| The accounts receivable and allowance for doubtful accounts claim (the "Accounts Receivable Claim") | The Acquired Companies' allowance for doubtful accounts as of Closing and as of several relevant pre-closing periods was materially understated and required adjustments to bad debt expenses, and such matters constitute breaches of several representations in the Purchase Agreement, including Section 3.4 (Financial Statements), Section 3.5 (Books and Records), and Section 3.8 (Accounts Receivable). | $5,807,000 |

On July 1, 2016, the State of Washington's Department of Revenue assessed Liquid Web $82,042.59 in taxes (the "Washington Tax").[37] LW Buyer claims that the "Hills were made aware of [the Washington Tax]," and LW Buyer paid that assessment on July 13.[38]

On July 8, Ernst & Young completed its preliminary analysis of Liquid Web's potential VAT liability in Norway, the United Kingdom, the Netherlands, Estonia, South Africa, Sweden, Spain, and other European Union countries.[39] The Hills sought clarification and further detail on the Claims by letters dated July 15, July 19, July 27, and August 10.[40]

On August 17, LW Buyer provided a spreadsheet showing its calculations for the various Claim amounts and supplying some predicate financial information to support those calculations (the "Spreadsheet").[41] LW Buyer increased its expected Losses in the Spreadsheet from $22,943,000 to $45,676,000. Part of that increase was attributed to recurring annual tax exposure (the "Recurring Exposure Claim"). The Hills sought more information in letters dated October 5 and December 15.[42]

---

[37] Flood Aff. ¶ 20.

[38] *Id.* ¶ 21; Counterclaims ¶ 65.

[39] Flood Aff. ¶¶ 23, 27.

[40] Compl. ¶¶ 44, 46, 48, 50.

[41] *Id.* ¶ 51 & Ex. 9.

[42] *Id.* ¶¶ 55-56.

On January 11, 2017, LW Buyer responded with narrative explanations of its Claims.[43]  The parties continued discussions until August 2017.

### C. The Hills Sue, And LW Buyer Mitigates Liquid Web's VAT Liability.

On August 15, 2017, the Hills brought this action seeking declaratory judgments as to the status of the Claims and a final determination ordering a release of portions of the Escrow Fund (the "Complaint").  On September 28, LW Buyer answered the Complaint, and brought its Counterclaims for breach of contract, indemnification, and declaratory judgments.  On October 18, the Hills answered the Counterclaims.

As these proceedings progressed, LW Buyer negotiated with various jurisdictions to mitigate Liquid Web's potential VAT liability.[44]  On December 7, 2017, and March 6, 2018, LW Buyer sought the Hills' consent to settle Liquid Web's VAT liability in certain jurisdictions for a total of approximately $6,364,964.  The Hills consented to a portion of those settlements.  On May 2, LW Buyer informed the Hills that it could settle all the contested and outstanding VAT liability for $312,350—less than 4% of the original exposure estimates.  The Hills consented on

---

[43] *Id.* ¶ 57.

[44] Section 11.8(e) of the Purchase Agreement requires any party seeking indemnification to "take all reasonable steps to mitigate any Loss to the extent required by applicable Legal Requirements upon becoming aware of any event or circumstance that would reasonably be expected to, or does, give rise to a Loss."

May 9, although they disclaimed any underlying liability. Since then, LW Buyer settled the VAT Claim for $312,350, and spent approximately $300,000 in advisors' fees to reach that conclusion.[45]

On August 31, the Hills moved for partial summary judgment (the "Motion") to resolve the Accounts Receivable, VAT, Sales and Use, Revenue Misstatements, and Recurring Exposure Claims.[46] The parties completed briefing on January 9, 2019, and presented argument on March 6, 2019 (the "Hearing").[47]

LW Buyer's claims crystallized over the course of briefing and at the Hearing. It "determined not to pursue indemnification for [the Accounts Receivable and Recurring Exposure Claims] from the escrow, but reserve[d] the right to pursue them at a later time from the Hills individually."[48] The parties dispute whether that reservation of rights warrants summary judgment in the Hills' favor, or dismissal based on mootness. Because the parties expressed a willingness to meet and confer

---

[45] Flood Aff. ¶¶ 36-52.

[46] D.I. 23. I refer to briefing on the Motion as the Hills' "Opening Brief," LW Buyer's "Answering Brief," and the Hills' "Reply Brief." D.I. 24, 33, 40. The Hills are not seeking judgment on the two additional disputed Claims—relating to capital lease obligations, undocumented costs, and transaction expenses—because they "may raise disputed factual questions and, in any event, involve relatively small amounts that the parties should be able to settle." Opening Br. 4. In the Complaint, the Hills also concede indemnification on a portion of the Claim relating to undocumented costs and transaction expenses. Compl. ¶ 84.

[47] D.I. 52 [hereinafter "Hearing Transcript"].

[48] Answering Br. 29 n.10.

14

on a stipulation to resolve those issues,[49] the Court requested that they "lay some manner of baseline stipulation as to the [Accounts Receivable, Recurring Exposure, and VAT Claims]."[50]

The parties were unable to agree to any stipulation. Instead, they submitted brief position letters on April 5 and 8, cementing a few more undisputed facts relevant to this opinion. First, LW Buyer seeks $620,558 in indemnification on the VAT Claim, and $330,000 in indemnification on the Sales and Use Claim.[51] And second, the Hills have withdrawn their Motion in part such that the Court "need not decide now whether the still-contested $620,558 of [the VAT Claim] is time barred or otherwise invalid."[52]

The remaining issues are: (i) the Revenue Misstatements Claim, (ii) the contested portion of the Sales and Use Claim, and (iii) whether the uncontested Claims and portions of Claims are moot or merit judgment in the Hills' favor.

---

[49] *See, e.g.*, Hearing Tr. 49, 77.

[50] *Id.* 81.

[51] *See* D.I. 51 at 3-4.

[52] D.I. 50 at 5. The Hills originally requested summary judgment awarding them reasonable fees and costs pursuant to the fee-shifting provision of the Purchase Agreement. But they have since withdrawn their fee-shifting request for the time being. *See id.*

## II.  ANALYSIS

"The function of summary judgment is the avoidance of a useless trial where there is no genuine issue as to any material fact."[53]  Summary judgment is appropriate where the "pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."[54]  "A fact is material if it 'might affect the outcome of the suit under the governing law.'"[55]  A material issue of fact exists if "a rational trier of fact could find any material fact that would favor the non-moving party in a determinative way, drawing all inferences in favor of the nonmoving party."[56]  But "[t]here is no 'right' to a summary judgment,"[57] and "[t]he Court maintains the discretion to deny summary judgment if it decides that a more thorough development of the record would clarify the law or its application."[58]

---

[53] *Emmert v. Prade*, 711 A.2d 1217, 1219 (Del. Ch. 1997).

[54] Ct. Ch. R. 56(c).

[55] *Deloitte LLP v. Flanagan*, 2009 WL 5200657, at *3 (Del. Ch. Dec. 29, 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[56] *Id.*

[57] *Telxon Corp. v. Meyerson*, 802 A.2d 257, 262 (Del. 2002).

[58] *Zimmerman v. Crothall*, 2012 WL 707238, at *5 (Del. Ch. Mar. 5, 2012) (citations and quotations omitted), *as revised* (Mar. 27, 2012).

16

In interpreting contracts, this Court's "task is to fulfill the parties' shared expectations at the time they contracted."[59] "Delaware adheres to an objective theory of contracts, [and so] the contract's construction should be that which would be understood by an objective, reasonable third party."[60] The Court can consider extrinsic evidence to interpret an ambiguous contract. But "a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[61] Put another way, "[a]mbiguity does not exist where the court can determine the meaning of a contract without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends."[62]

### A. The Court Denies Summary Judgment On The Revenue Misstatements Claim.

LW Buyer asserts the Revenue Misstatements Claim based alleged breaches of the representations and warranties. The First Notice listed a series of representations and warranties, but the Counterclaims specify that Liquid Web's

---

[59] *Leaf Invenergy Co. v. Invenergy Renewables LLC*, — A.3d —, 2019 WL 1965888, at *6 (Del. May 2, 2019) (quotations omitted).

[60] *Id.* at *6 (quotations omitted).

[61] *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).

[62] *Id.* at 1196 (quotations omitted).

monthly financial statements or records[63] for December 2014, January 2015, and February 2015 (the "Monthly Financials")[64] were in breach of Sections 3.4 and 3.5 of the Purchase Agreement.[65] Section 3.4 addresses the accuracy of the Companies' Financial Statements, while Section 3.5 governs "books of account and other Records."[66]

The Hills challenge the Revenue Misstatements Claim on two fronts: first, that the Hills never represented or warranted the accuracy of the Monthly Financials; and second, that LW Buyer's First Notice failed to provide the "factual basis of the [Claim] in reasonable detail to the extent known by [LW Buyer]" as required by Section 11.4(a).[67] I disagree with the first argument, and find that the second is not amenable to decision on summary judgment. The Hills' Motion on the Revenue Misstatements Claim is denied.

---

[63] The parties differ in how they characterize the materials at issue—for purposes of this opinion, that distinction does not matter.

[64] Counterclaims ¶ 30; Answering Br. 30.

[65] Counterclaims ¶¶ 89-98. The Counterclaims also reference the terms of a disclosure letter, but the parties do not address this factual nuance in the briefing. I thus find that LW Buyer has waived reliance on it to oppose the Motion. *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

[66] Purchase Agreement §§ 3.4, 3.5.

[67] *Id.* § 11.4(a).

### 1. The Revenue Misstatements Claim May Derive From Monthly Financial Records.

Section 3.4 provides that the Financial Statements must be "accurate and complete in all material respects," and lists specific requirements for gauging that accuracy and completeness. Section 3.5 provides more generally that "[t]he books of account and other Records of each Acquired Company that have been made available to [LW Buyer], are materially complete and correct, and represent actual and bona fide transactions."

The parties dispute whether any representation or warranty governs the Monthly Financials. The Hills argue that Section 3.4, the far more specific provision, represents the accuracy and completeness of only certain named financial records, and did not name the Monthly Financials. The Hills also argue that they did not represent or warrant the Monthly Financials in Section 3.5, because the Monthly Financials are the same type of record as those enumerated in Section 3.4, which Section 3.5 cannot address without stepping on Section 3.4. The Hills conclude that only Section 3.4 could represent or warrant the accuracy or completeness of any financial statements, and thus that they did not represent or warrant the accuracy of the Monthly Financials.

LW Buyer argues that Section 3.5 governs the Monthly Financials by its plain and unambiguous language, and that Section 3.5 does not conflict with Section 3.4 or address the Monthly Financials at all. LW Buyer interprets the more specific

representations in Section 3.4 as applying stricter standards only to the enumerated Financial Statements. And because the Monthly Financials are not included within the Financial Statements, LW Buyer concludes they fall under the more general Section 3.5.

"The contract must [] be read as a whole, giving meaning to each term and avoiding an interpretation that would render any term mere surplusage."[68] "Specific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one."[69] Here, Section 3.4, as the more specific provision, must limit the overlapping language in Section 3.5. If it did not, Section 3.5 would cover even the Financial Statements and be at least partly redundant of Section 3.4's similar, more stringent demands.[70]

This Court addressed a similar question in *ClubCorp, Inc. v. Pinehurst, LLC*.[71] There, the Court considered whether a general contractual loss provision permitted

---

[68] *Sunline Commercial Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 846 (Del. 2019) (quotations omitted).

[69] *DCV Hldgs., Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005).

[70] *See Sunline Commercial Carriers*, 206 A.3d at 846; *Reybold Venture Grp. XVI LLC v. Cresswell*, 2014 WL 7010757, at *3 (Del. Super. Ct. Nov. 26, 2014) ("[A] contract should be read to give effect to all the provisions of the contract and not render one provision superfluous or redundant."), *aff'd,* 115 A.3d 1215 (Del. 2015).

[71] 2011 WL 5554944 (Del. Ch. Nov. 15, 2011).

indemnification of tax claims.[72]  The general provision did not name tax claims among its covered losses.  But another provision "expressly provide[d] for indemnification of taxes," although "on a more limited basis than would" the general provision.[73]  The Court concluded that "to whatever extent [the general and specific provisions] might conflict if [the general provision] applied equally to tax matters, [the specific provision] would be the narrower of the two provisions and, therefore, control."[74]

The interplay between Sections 3.4 and 3.5 does not, as the Hills suggest, require reading out any representation or warranty of the Monthly Financials.  Under its plain meaning, Section 3.4 removes only the named Financial Statements, not additional unnamed records, from Section 3.5's more general representation.  Although Section 3.5 is qualified by Section 3.4 with regard to Financial Statements, that does not compel a conflict regarding all financial materials.  To impose that conflict would require me to re-write the parties' agreement and "upset[] the allocation of risk deliberately established by the" Purchase Agreement.[75]  I conclude

---

[72] *Id.* at *11.

[73] *Id.*

[74] *Id.*; *see also Delta Hldgs., Inc. v. Nat'l Distillers & Chem. Corp.*, 945 F.2d 1226, 1248 (2d Cir. 1991).

[75] *Delta Hldgs.*, 945 F.2d at 1248.  Reading Sections 3.4 and 3.5 this way comports with how these kinds of provisions typically interact.  As explained by the drafters of the American Bar Association's Model Stock Purchase Agreement, provisions like Section 3.5

Section 3.5 covers the Monthly Financials to the extent the Monthly Financials are not included in Section 3.4's more specific representations. "Consistent with foundational principles of contract interpretation, this construction harmonizes and gives meaning to both provisions at issue, obviating any need to prefer one over the other."[76] Accordingly, the Hills' motion for summary judgment based on the premise that they did not represent or warrant the Monthly Financials is denied.

### 2. LW Buyer's First Notice Presents Issues Not Amenable To Summary Judgment.

The Hills also claim that the First Notice failed to satisfy Section 11.4(a)'s requirement to specify the Revenue Misstatements Claim's "factual basis in reasonable detail." The First Notice asserted that "[i]naccuracies in the conversion of the Acquired Companies' cash basis books to accrual basis financial statements led to materially misstated revenue and revenue growth on an intra-period basis," provided an itemized list of allegedly breached provisions, and estimated the Loss.

---

cover "books of account . . . [as] the basis of the financial statements" of more specific provisions like Section 3.4. ABA Mergers and Acqs. Comm., *Model Stock Purchase Agreement With Commentary* (2d ed. 2010) § 3.5 cmt. at 100. That is because "[i]f the books of account are inaccurate or incomplete, the information provided [in the financial statements] . . . will be suspect and the financial statements will be of little value to Buyer." *Id.* Provisions like Section 3.5 "go behind the financial statements by requesting representations concerning the quality of the [a]cquired [c]ompanies' recordkeeping." *Id.*

[76] *Acela Invs. LLC v. DiFalco*, 2019 WL 2158063, at \*22 (Del. Ch. May 17, 2019).

Where parties have completely omitted the bases for an indemnification claim in a notice, or attempted to retroactively fit a new claim into a prior notice, this Court has granted summary judgment for failure to give sufficient notice of that claim.[77] But on the limited question of the specificity or detail in a claim, the Court has concluded that the reasonable quantum of detail "depends on the circumstances and the allegations; in other words, it involves questions of fact."[78] On similar facts and contractual language, this Court held that "the [contractual] term 'reasonable particularity' is susceptible to two reasonable interpretations" because it could mean either "to itemize the particular representations and warranties that were breached, such that the other party is on 'notice,'" or to require "significantly more detail."[79] Because of that ambiguity, and because the Court found that interpretation of the claim notice would benefit from development at trial, the Court denied summary judgment.

---

[77] *See i/mx Info. Mgmt. Sols., Inc. v. Multiplan, Inc*, 2014 WL 1255944, at *12 (Del. Ch. Mar. 27, 2014); *Winshall v. Viacom Int'l Inc.*, 2012 WL 6200271, at *3 n.20, *8 (Del. Ch. Dec. 12, 2012), *aff'd,* 76 A.3d 808 (Del. 2013).

[78] *ChyronHego Corp. v. Wight*, 2018 WL 3642132, at *11 (Del. Ch. July 31, 2018).

[79] *Impact Invs. Colo. II, LLC v. Impact Hldg., Inc.*, 2012 WL 3792993, at *8 (Del. Ch. Aug. 31, 2012).

The First Notice may very well have fallen short of Section 11.4(a)'s requirements. But the issue raises questions of fact and would benefit from development at trial.[80] Summary judgment on this point is denied.

## B. The Court Grants Summary Judgment On The Sales And Use Claim Without Prejudice To Future Contractual Indemnification Claims.

LW Buyer's First Notice presented the Sales and Use Claim as follows:

> Buyer's investigation is ongoing, but it appears the Acquired Companies have obligations and other types of Loss with respect to sales and use taxes in various jurisdictions (including Washington, California, Arizona, and Michigan). The existence of such obligations and other forms of Loss would constitute breaches of several representations in the Purchase Agreement (including Section 3.9 (No Undisclosed Liabilities), Section 3.10 (Taxes), and Section 3.13 (Compliance with Legal Requirements)) and such obligations and other forms of Loss would also constitute Indemnified Taxes.[81]

LW Buyer currently seeks $330,000 in indemnification for its Sales and Use Claim, based on Losses from both Indemnified Taxes and breaches of representations and warranties.[82] The parties' submissions do not clearly explain the source of that

---

[80] *Zimmerman*, 2012 WL 707238, at *5.

[81] *See* First Notice at 3.

[82] Although LW Buyer's Counterclaims also rely on Section 11.2(e) for the Sales and Use Claim, the Hills argued in their Opening Brief that the First Notice never raised Section 11.2(e) and, thus, LW Buyer is time-barred from relying on it. Counterclaims ¶ 101; Opening Br. 27 n.59. LW Buyer did not invoke or mention Section 11.2(e) in its Answering Brief or at the Hearing. Without reaching the merits of the Hills' argument as to Section 11.2(e), I find that LW Buyer has waived reliance on it for purposes of this Motion. *See Emerald P'rs*, 726 A.2d at 1224 ("Issues not briefed are deemed waived.").

number.  It appears to represent LW Buyer's current estimate of the amount of sales and use tax the Companies should have paid for the years 2012 through 2014, and the period between January 2015 to June 2015.[83]  It also appears to include the Washington Tax.[84]

The Hills agreed to indemnify and hold harmless LW Buyer and the Companies from "any Loss that [LW Buyer or other relevant parties] may suffer, sustain, or become subject to, as a result of, in connection with, or relating to:  (a) any Breach of any representation or warranty made by Sellers . . .; [or] (d) any Indemnified Taxes."[85]  A Loss may include, among other things, "any . . . Tax," which the Purchase Agreement requires to be "imposed, assessed, or collected."[86]  A Loss relating to Indemnified Taxes similarly must be "Taxes (or the non-payment thereof) imposed on the Companies."[87]

---

[83] Counterclaims ¶ 65.

[84] *Id.* ¶¶ 102-103.

[85] Purchase Agreement § 11.2.

[86] *Id.* § 1.1.

[87] *Id.*  The definition of Losses also provides for "liabilit[ies] (contingent or otherwise)." *Id.*  The parties did not focus on this issue in their briefing, and LW Buyer only raised it in passing at the Hearing.  *See* Hearing Tr. 71-72 ("This is a contingent liability.  It's a liability that we owe.  And even though we haven't paid it out yet, it is a tax that is owed in another jurisdiction.").  I find that LW Buyer's Losses are in the category of a "Tax," not a "liability (contingent or otherwise)."  *See ClubCorp*, 2011 WL 5554944, at *11 ("[I]nsert[ing] the defined term 'Taxes' into the definition of 'Loss'" indicates parties' intent to "include taxes among the various costs encompassed within the term 'Loss'").  The only source of harm from the Sales and Use Claim is tax liability and related expenses arising from the alleged

Other than the Washington Tax, LW Buyer has not suffered the Losses alleged in its Sales and Use Claim.[88] This raises ripeness concerns. "A ripeness determination requires a common sense assessment of whether the interests of the party seeking immediate relief outweigh the concerns of the court in postponing review until the question arises in some more concrete and final form."[89] "Delaware courts 'typically decline to decide issues that may not have to be decided or that create hypothetical harm.'"[90] "Ripeness, the simple question of whether a suit has

failure to appropriately collect and pay the Companies' taxes. *See* Counterclaims ¶¶ 102-103. Taxes must be "imposed, assessed, or collected"—they cannot be contingent. Purchase Agreement § 1.1. Reading "liability (contingent or otherwise)" to include Tax liability would overlap entirely with the defined term of "Taxes," and elide the requirement that the Taxes be "imposed, assessed, or collected." *Id.* Under a plain reading of the Purchase Agreement, the parties intended to confine all tax-related Losses to those that meeting the definition of a "Tax." *Reybold Venture Grp.*, 2014 WL 7010757, at *3 ("[A] contract should be read to give effect to all the provisions of the contract and not render one provision superfluous or redundant."). This reading makes sense, as the parties also bargained to permit LW Buyer to bring Section 11.4(c) claims—including for Indemnified Taxes—after the Survival Period Termination Date, and so there would be little reason to permit contingent Tax Loss claims prior to that Date.

[88] *See* Counterclaims ¶¶ 102-103; First Notice.

[89] *XI Specialty Ins. Co. v. WMI Liquid. Tr.*, 93 A.3d 1208, 1217 (Del. 2014) (quotations omitted); *see also id.* 1217-18 ("Generally, a dispute will be deemed ripe if litigation sooner or later appears to be unavoidable and where the material facts are static. Conversely, a dispute will be deemed not ripe where the claim is based on uncertain and contingent events that may not occur, or where future events may obviate the need for judicial intervention." (quotations omitted)).

[90] *Boilermakers Local 154 Ret. Fund v. Chevron Corp.*, 73 A.3d 934, 940 (Del. Ch. 2013) (quoting 3 Stephen A. Radin, *The Business Judgment Rule: Fiduciary Duties of Corporate Officers* 3498 (6th ed. 2009)), *judgment entered sub nom. Boilermakers Local 154 Ret. Fund & Key W. Police & Fire Pension Fund v. Chevron Corp.* (Del. Ch. 2013).

been brought at the correct time, goes to the very heart of whether a court has subject matter jurisdiction."[91]

At the time of the First Notice, the Sales and Use Claim was not based on payment, or even an agreement to pay, any tax liability. LW Buyer based the Claim solely on Ernst & Young's ongoing analysis and estimates of its tax exposure. With the exception of the Washington Tax, the Companies have yet to pay or be assessed any taxes that may fall under the Sales and Use Claim. LW Buyer argues that "it [is] not a question of whether the company [will] have to make payments to taxing authorities, but rather, how much it [will] have to pay."[92]

Both questions must be answered before the Sales and Use Claim is ripe. Otherwise, LW Buyer could seek indemnification—and reap a windfall—for speculative Losses that it never actually suffered. Such a payment would be antithetical to the concept of indemnification: repaying a loss to make the indemnitee whole.[93] Nor does indemnifying LW Buyer's inchoate Loss make practical sense. For instance, if the Hills were to indemnify LW Buyer for an

---

[91] *Bebchuk v. CA, Inc.*, 902 A.2d 737, 740 (Del. Ch. 2006).

[92] Answering Br. 19.

[93] *See Horton v. Organogenesis Inc.*, 2019 WL 3284737, at *4 (Del. Ch. July 22, 2019) ("[T]he purpose of the [m]erger [a]greement's indemnification provisions" is "to indemnify and hold harmless the indemnitee from and against [l]osses incurred"); *Nw. Nat'l Ins. Co. v. Esmark, Inc.*, 1996 WL 527349, at *5 (Del. Super. Ct. Aug. 9, 1996) ("The purpose of an indemnity contract is to make the indemnitee whole.").

estimated Sales and Use Claim that exceeded the Companies' actual and eventual sales and use tax payments, presumably LW Buyer would have to pay the Hills back the difference. Determining damages presents similar problems of proof. When asked at the Hearing how it would prove the amount of Loss before paying or agreeing to pay that Loss, LW Buyer indicated that the parties could hire and present "experts talking about the taxes that are owed in these jurisdictions."[94] These issues support my "common sense assessment" that LW Buyer's Sales and Use Claim is largely unripe.[95]

This Court has dismissed without prejudice unripe contractual indemnification demands that rely on predictions that a party "may face future additional [l]osses," like the Sales and Use Claim.[96] While the Purchase Agreement and the contracts in those cases differ on various points, I find the cases instructive. As in *Kilcullen v. Spectro Scientific, Inc.*, LW Buyer's "alleged 'exposure' is insufficient to render its indemnification claim ripe under the governing language" because "the potential claims [LW Buyer] raises may never be asserted and [LW Buyer] may never suffer harm."[97] This case is also analogous to *Horton v.*

---

[94] Hearing Tr. 73.

[95] *XI Specialty Ins. Co.*, 93 A.3d at 1217.

[96] *Kilcullen v. Spectro Sci., Inc.*, 2019 WL 3074569, at *7 (Del. Ch. July 15, 2019).

[97] *Id.* at *7.

*Organogenesis Inc.*, where the Court dismissed without prejudice unripe third-party indemnification demands because the asserting party's "position ignore[d] the purpose of the [m]erger [a]greement's indemnification provisions—to indemnify and hold harmless the indemnitee from and against [l]osses incurred."[98]

I conclude LW Buyer's claims for indemnification under Sections 11.4(a) and (c) are unripe. LW Buyer may still be able to pursue indemnification for sales and use taxes that materialize: it can notice claims for Indemnified Taxes under Section 11.4(c) "at any time," and the parties recognized an "indefinite" contractual survival period for those claims.[99] The parties bargained for that indefinite period, presumably in recognition that tax-related liabilities may not have been ripe by the Survival Period Termination Date. Although LW Buyer may be able to pursue these same tax Losses later, the Sales and Use Claim cannot proceed against the Hills or hold up disbursal of the Escrow Funds as presently based on estimated tax liabilities that have not yet been imposed or suffered. I grant summary judgment on the

---

[98] *Organogenesis Inc.*, 2019 WL 3284737, at *4. While I recognize the differences between the Purchase Agreement's language indemnifying against Losses that LW Buyer "may suffer, sustain, or become subject to," and the language the parties agreed to in *Organogenesis* indemnifying against losses "that any [b]uyer [i]ndemnitee incurs," I find the provisions sufficiently analogous in this circumstance. *Id.*

[99] The Hills acknowledge that "[u]nlike claims based on breaches of representations and warranties under Section 11.2(a), claims based on Indemnified Taxes do not have to be asserted before the Survival Period Termination Date," because "indemnification for Indemnified Taxes may be sought at any time under Section 11.4(c)." Reply Br. 29. The parties have not raised any concern over outer limitations periods for these claims.

inchoate portion of the Sales and Use Claim to the Hills, without prejudice to LW Buyer's ability to raise or renew claims later in a manner permitted by the Purchase Agreement.

As for the Washington Tax, the Hills contend that LW Buyer never notified them of, or obtained their consent to settle and pay, that tax.[100] According to the Hills, LW Buyer's failure to provide the Hills notice of the Washington Tax, or obtain their consent in resolving it, violated one or all of Sections 11.6(a), (b)(ii), and (c). Section 11.6 requires the party seeking indemnification to "giv[e] notice of a Third-Party Claim" to the indemnifying party, and gives an indemnifying party the right to "assume the defense of" Third-Party Claims in certain situations.[101] LW Buyer asserts that "[t]he Hills were made aware of [the Washington Tax] assessment" and of LW Buyer's payment of the Washington Tax, although it provides no supporting documentation.[102] For now, I assume, without deciding, that LW Buyer provided the Hills notice of the Washington Tax under Section 11.6(a).

---

[100] *See* Opening Br. 38 n.72.

[101] Purchase Agreement §§ 11.6(a)-(b); *see also id.* § 11.6(a) ("[P]rovided, however, that no failure or delay on the part of an Indemnified Person in notifying an Indemnifying Person will relieve the Indemnifying Person from any obligation under [Section 11] except to the extent that the failure of delay materially adversely affects resolution of the Third-Party Claim.").

[102] *See* Answering Br. 19. LW Buyer cites the Flood Affidavit, which states: "The Hills were made aware of [the Washington Tax], and LW Buyer paid that $82,042.59 assessment on July 13, 2016. The Hills were again notified about the Washington assessment and payment on August 17, 2016, and January 11, 2017." Flood Aff. ¶ 21. Neither the

No party argues that the Hills assumed the defense of the Washington Tax, and it appears from LW Buyer's payment that LW Buyer handled the process. In that circumstance, either Section 11.6(b)(ii) or (c) governs. Section 11.6(b)(ii) mandates:

> If the Indemnifying Person does not assume the defense of a Third-Party Claim in the manner and within the period provided in Section 11.6(b)(i), or if the Indemnifying Person does not diligently conduct the defense of a Third-Party Claim, the Indemnified Person may conduct the defense of the Third-Party Claim at the expense of the Indemnifying Person and the Indemnifying Person shall be bound by any determination resulting from the Third-Party Claim, ***provided that the Indemnified Person shall obtain the prior consent of the Indemnifying Person for any compromise or settlement of the Third-Party Claim***, which may not be unreasonably withheld or delayed.[103]

Section 11.6(c) provides that "[n]otwithstanding the foregoing, if the Third-Party Claim . . . (iv) involves Taxes of the Acquired Companies, . . . or (vii) involves reasonably foreseeable Losses that would exceed the then-current Escrow Funds (net of any unresolved claims)," LW Buyer could "by notice to" the Hills "assume the exclusive right to defense, compromise, or settle the Third-Party Claim." But, like Section 11.6(b)(ii), there is a catch: "the Indemnifying Person shall not be bound by any compromise or settlement effected without its prior consent, which may not be

---

Answering Brief nor the Flood Affidavit make clear how or when LW Buyer notified the Hills of the Washington Tax.

[103] Purchase Agreement § 11.6(b)(ii) (emphasis added).

31

unreasonably withheld or delayed."[104] The parties do not explain which provision should apply.[105] But I need not reconcile them at this point because both required that LW Buyer obtain the Hills' consent to compromise or settle the Washington Tax.

LW Buyer recognized that Section 11.6 generally requires the Hills' consent, but has not asserted that it sought or obtained the consent required to settle the Washington Tax under either Section 11.6(b)(ii) or (c).[106] Nor has LW Buyer meaningfully contested the Hills' arguments that failure to obtain their consent renders the Washington Tax not subject to indemnification.[107] I find that LW Buyer waived opposition to this issue, and, as a result, I grant summary judgment in favor of the Hills on this portion of the Sales and Use Claim.[108]

---

[104] *Id.* § 11.6(c).

[105] *See* Opening Br. 38 n.72 (arguing that "under Sections 11.6(b)(ii) and 11.6(c), LW Buyer was not permitted to settle the claim without consent from the Hills, and it is undisputed that LW Buyer never requested, much less obtained such consent").

[106] *See* Answering Br. 14, 23-24, 44 n.17.

[107] LW Buyer's only engagement on this issue was a passing statement at the Hearing that the Washington Tax "was not a settlement or a compromise" that required the Hills' consent under Section 11.6, because LW Buyer "[was] assessed $80,000 in sales and use tax by the State of Washington, and [] paid it." Hearing Tr. 71. It did not raise this theory in its briefing.

[108] *See Emerald P'rs*, 726 A.2d at 1224 ("Issues not briefed are deemed waived."); *Winshall v. Viacom Int'l, Inc.*, 55 A.3d 629, 642 (Del. Ch. 2011) (where argument was raised for the first time at hearing, "argument was [] not fairly or timely presented and was waived"), *aff'd*, 76 A.3d 808 (Del. 2013). I do not reach the Hills' other arguments on the merits of the Washington Tax claim. *See* Opening Br. 38 n.72.

**C. The Court Grants Summary Judgment On The Accounts Receivable and Recurring Exposure Claims, And Will Not Enter An Order Capping Liability For The VAT Claim At This Time.**

Finally, I address the procedural resolution of the substantively uncontested Claims: (i) the Accounts Receivable and Recurring Exposure Claims in their entirety, and (ii) the uncontested amounts of the Sales and Use and VAT Claims. On the second issue, I have already granted summary judgment on the Sales and Use Claim, and so I only discuss a potential limitation on the VAT Claim. The Hills seek judgment in their favor on the Accounts Receivable and Recurring Exposure Claims, and a judgment that the VAT claim cannot exceed the amounts LW Buyer currently seeks. In doing so, the Hills hope to limit current and future indemnification Claims against themselves personally or the Escrow Funds.

LW Buyer instead seeks a mootness finding as to the Accounts Receivable and Recurring Exposure Claims, arguing that it no longer seeks indemnification on those Claims from the Escrow Funds. LW Buyer also argues that the Court should not enter partial judgment capping liability on the VAT Claim at this time. While LW Buyer is pursuing specified amounts on that Claim now, "taxing authorities could in the future seek to recover more than these amounts, or assert new claims for additional pre-closing taxes," and so "LW Buyer must reserve the right to seek

indemnification for any such claims, either from the escrow funds (if funds are still available) or from Hills themselves."[109]

The Hills seek summary judgment on their declaratory judgment claims. They brought those claims to resolve an anticipated controversy based on LW Buyers' Claims both against the Escrow Funds and against the Hills personally. Declaratory judgment requires an "actual controversy" "in which the claim of right or other legal interest is asserted against one who has an interest in contesting the claim."[110] Where there is no controversy, the Court does not have jurisdiction to enter declaratory judgment. "[A]lthough there may have been a justiciable controversy at the time the litigation was commenced, the action will be dismissed if that controversy ceases to exist."[111]

LW Buyer originally purported to drop the Accounts Receivable and Recurring Exposure Claims against the Escrow Funds, while reserving them against the Hills individually.[112] At the Hearing, LW Buyer's counsel elaborated:

---

[109] D.I. 51 at 4.

[110] *Rollins Int'l Inc. v. Int'l Hydronics Corp.*, 303 A.2d 660, 662 (Del. 1973).

[111] *Gen. Motors Corp. v. New Castle Cty.*, 701 A.2d 819, 823 (Del. 1997).

[112] Answering Br. 29 n.10 ("The Hills also seek summary judgment on the 'Accounts Receivable Claim' or 'Recurring Annual Exposure' claims . . . . However, LW Buyer has determined not to pursue indemnification for those claims from the escrow, but reserves the right to pursue them at a later time from the Hills individually.").

34

> [LW Buyer] has no current intention to pursue either the [Accounts Receivable and Recurring Exposure Claims] claim against the Hills individually or the escrow fund. It's just not something that my client has any intention of doing at this point in time. So yes, we reserve some rights in those footnotes, probably out of an abundance of caution, but it's just not something that we expect ever to occur or to happen.[113]

Under that scenario, LW Buyer may have mooted the Accounts Receivable and Recurring Exposure Claims as against the Escrow Funds by removing that portion of the dispute from justiciable controversy.

But after the Hearing, LW Buyer clarified that it was reserving the Claims against "either [] the escrow funds (if funds are still available) or from the Hills themselves."[114] LW Buyer has not withdrawn the Claims from dispute. Instead, it hung them like a sword poised to drop on the Escrow Fund or the Hills at some unspecified later date. A controversy thus remains as to whether LW Buyer can pursue the Accounts Receivable and Recurring Exposure Claims against the Escrow Funds, or against the Hills individually, in the future. A controversy also remains as to whether the Escrow Funds can be released with respect to these Claims. The Hills sought declaratory judgment to resolve these issues and moved for summary judgment on them. LW Buyer elected to insert a placeholder for later claims, rather than assert a defense. I grant summary judgment to the Hills on these Claims.

---

[113] Hearing Tr. 48-49.

[114] D.I. 51 at 4.

35

The Hills also seek judgment capping the liability of the VAT Claim at $620,558. The parties withdrew the merits of the VAT Claim from my consideration for the time being. I decline to limit the Claim at this time: the terms of the parties' bargain counsel against such an order. As noted in finding part of the Sales and Use Claim unripe, LW Buyer's pre-closing tax liability for the Companies may change in the future, and Section 11.4(c) of the Purchase Agreement permits LW Buyer to notice tax-related indemnification claims after the Survival Period Termination Date. But LW Buyer has waived its ability to further hold up the Escrow Funds to support the VAT Claim in excess of the amounts it has specified.[115] To the extent LW Buyer's tax liability for the Companies grows under that Claim, and the Escrow Funds are no longer available, it will have to pursue indemnification against the Hills.

The parties litigated this procedural dispute in the shadow of Section 12.13 of the Purchase Agreement, which permits a "prevailing party" to receive reasonable fees and costs for its "action, claim, complaint, proceeding, judgment . . . or suit."[116]

---

[115] *Cf. Hermelin v. K-V Pharm. Co.*, 2011 WL 6225377, at *1 (Del. Ch. Dec. 13, 2011) ("Having waived its right to contest indemnification with respect to [certain issues], and having specifically waived the right to claw back amounts paid, the Defendant and its assigns are barred from further actions inconsistent with such waiver. Moreover, I have relied specifically on the Defendant's waivers in reaching my decision here, and thus the Defendant and its assigns are judicially estopped from litigating the issue in this or any court in a manner inconsistent with its representations here.").

[116] *See* Purchase Agreement §§ 1.1, 12.13.

That dispute is not squarely before me—the parties did not substantially brief it, and the Hills' April 5 letter withdrew the issue until later in this proceeding. I will hear the fee-shifting arguments at that time, and the parties should not interpret my determinations here as resolving the specific question of who prevailed under Section 12.13.

## III. CONCLUSION

The Court GRANTS IN PART and DENIES IN PART the Hills' Motion for Partial Summary Judgment. LW Buyer may continue to assert the Revenue Misstatements Claim and the VAT Claim[117] against the Escrow Funds. I do not comment here on any Claims not litigated or at issue in the Motion. The parties shall coordinate to submit a proposed order, or competing proposed orders, consistent with this opinion.

---

[117] As limited by LW Buyer's representations and this opinion to $620,558.02 against the Escrow Funds.